1  BRIAN R. MILDENBERG, ESQUIRE (PA BAR ID. 84861) *(pro hac vice)*
2  MILDENBERG LAW FIRM, PC
   1735 Market Street, Suite 3750
3  Philadelphia, PA 19103
   (215) 545-4870
4  brian@mildenberglaw.com

5  *Related cases listed on next page.*

6  Attorney for Plaintiff
7  ELDRIDGE JOHNSON

**UNREDACTED
VERSION OF
DOCUMENT(S)
SOUGHT TO
BE SEALED**

8              UNITED STATES DISTRICT COURT

9            NORTHERN DISTRICT OF CALIFORNIA

10 ELDRIDGE JOHNSON,                    )   CASE NO. 3:12-cv-02730-VC
                                        )
11              Plaintiff,              )   **[CORRECTED]**
                                        )   **SEVENTH AMENDED COMPLAINT**
12                                      )   **FOR DAMAGES AND INJUNCTIVE**
                                        )   **RELIEF FOR RACE DISCRIMINATION**
13          vs.                         )   **AND ASSOCIATED VIOLATIONS OF**
                                        )   **42 U.S.C. § 1981, TITLE VII OF THE**
14 UNITED AIR LINES, INC.;              )   **CIVIL RIGHTS ACT OF 1964,**
   CONTINENTAL AIRLINES, INC.; and      )   **AS AMENDED, 42 USC § 1985,**
15 DOES 1-10,                           )   **CALIFORNIA FAIR EMPLOYMENT**
                                        )   **AND HOUSING ACT, and**
16              Defendants.             )   **BREACH OF CONTRACT**
                                        )
17                                      )
                                        )
18                                      )
                                        )
19                                      )
                                        )
20                                      )
                                        )
21                                      )
                                        )
22                                      )
                                        )
23                                      )
                                        )
24 _____     )   JURY TRIAL DEMANDED

25

26

27

28

Case No. 3:12-cv-02730-VC

1

*Related cases:*

2

Johnson, Eldridge v. United Airlines, Inc., et al. 3:12-cv-02730-VC

3

Ecung, Mario v. United Airlines, Inc. et al. 3:15-cv-00456-VC
Miller, Leon v. United Airlines, Inc. et al. 3:15-cv-00457-VC

4

Palmer, Xavier v. United Airlines, Inc. et al. 3:15-cv-00458-VC
Montgomery, United Airlines, Inc. et al. 3:15-cv-00459-VC

5

Gadson, Annette v. United Airlines, Inc. et al. 4:15-cv-00460-VC
Noble, Paul C. v. United Airlines, Inc. et al. 3:15-cv-00461-VC

6

Jones Jr., Johnnie E. v. United Airlines, Inc. et al. 3:15-cv-00462-VC

7

Robinson, Frederick v. United Airlines, Inc., et al. 3:15-cv-00463-VC
Roane, Glen v. United Airlines, Inc. et al. 3:15-cv-00464-VC

8

Ricketts, David v. United Airlines, Inc. et al. 3:15-cv-00465-VC
Tom, Lester v. United Airlines, Inc. et al. 3:15-cv-00466-VC

9

Crocker, Sal v. United Airlines, Inc. et al. 3:15-cv-00468-VC
Manswell, Anthony v. United Airlines, Inc. et al. 3:15-cv-00469-VC

10

Minter, Karl v. United Airlines, Inc. et al. 3:15-cv-00470-VC

11

Washington, Erwin v. United Airlines, Inc. et al. 4:15-cv-00471-VC
Wilson, Darryl v. United Airlines, Inc. et al. 3:15-cv-00472-VC

12

Sherman, Leo v. United Airlines, Inc. et al. 3:15-cv-00473-VC
Haney, Ken v. United Airlines, Inc. et al. 3:15-cv-00474-VC

13

John, Richard v. United Airlines, Inc. et al. 3:15-cv-00475-VC
Briscoe, Odie v. United Airlines, Inc. et al. 3:15-cv-00476-VC

14

Hartsfield, Terrence v. United Airlines, Inc. et al. 3:15-cv-00477-VC

15

///
///

16

17

18

19

20

21

22

23

24

25

26

27

28

**[CORRECTED] SEVENTH**
**AMENDED COMPLAINT**

**COMES NOW** Plaintiff, ELDRIDGE JOHNSON, by and through undersigned Counsel, MILDENBERG LAW FIRM PC, complaining of Defendants, UNITED AIRLINES, INC. and CONTINENTAL AIRLINES, INC. (collectively, "United"), and respectfully requests this Honorable Court to enter judgment in his favor, and against Defendants, and in support thereof, alleges, upon information and belief, as follows:

**I.     Introductory Statement**

1.     Plaintiff, Eldridge Johnson, an African American airline pilot now retired and formerly employed by Defendant United Airlines, Inc., brings this action seeking relief from intentional discrimination on the basis of his race and the color of his skin.  Plaintiff, who was employed with United since in or around 1978, is the victim of long term racially discriminatory practices of United concerning the terms and conditions of his employment, including the denial and restriction of promotional opportunities and job assignments.

2.     Plaintiff has labored in a racially hostile work environment and has, since the filing of this litigation in 2012, been subjected to intimidating, retaliatory acts by United. Plaintiff respectfully seeks injunctive and monetary remedies, attorney's fees, costs of suit and an award of punitive damages to punish and deter United from continuing the discriminatory policies and practices complained of herein.

**II.     Jurisdiction and Venue**

3.     This Honorable Court has jurisdiction over this matter pursuant to 28 U.S.C. 1331, 42 USC 2000e et seq., and 42 USC 1981.

4.     Venue is proper in the Northern District of California because some of the matters complained of herein occurred or arise from events in the Northern District of California;

Plaintiff suffered acts of retaliation as alleged *infra* because of his participation in the filing of this litigation in the Northern District of California in the year 2012; some employment records relating to Defendants' promotions and job assignments are located in the Northern District of California; and, and Plaintiff was denied the opportunity to partake in desirable employment opportunities in the Northern District of California.

### III.   Parties

5.     Plaintiff, Eldridge Johnson, is an adult individual residing at the address listed on the docket of this action.

6.     Defendant, United Airlines, Inc., is a corporation duly organized and existing under the laws of the state of Delaware, with an address for service as listed on the docket of this action.

7.     Defendant, Continental Airlines, Inc., upon information and belief, is a corporation duly organized and existing under the laws of the state of Delaware, with an address for service as listed on the docket of this action.  Upon information and belief, in or around 2012, Continental Airlines merged with United Airlines in a merger whereby the parent company of United Airlines acquired all of the stock of Continental Airlines and subsequently changed the name of Continental Airlines to United Airlines.  The merger was announced and began in or around 2010.  Defendant United Airlines, Inc., upon information and belief, is the successor in interest to the merger between United and Continental.

8.     Defendants, DOES # 1-10, are individuals or entities the identity of which is unknown to Plaintiff at this time, and who participated in the acts of discrimination and retaliation complained of herein.  Plaintiff reserves the right to substitute the true names and identities of the Doe Defendants upon discovery of same in the course of this litigation.

### IV.   Facts

9.      The allegations in the foregoing paragraphs are incorporated herein by reference.

**A.      United's History of
Racial Discrimination and Federal Intervention**

10.      On April 14, 1973, the United States initiated litigation against United alleging, *inter alia,* a pattern and practice of race-based discrimination against African Americans in hiring, termination, and other employment practices.  The case was captioned *USA v. United Airlines, Inc.,* and was filed in the United States District Court for the Northern District of Illinois, Eastern Division, Civil Action No. 73-C-972.

11.      On April 30, 1976, the court entered a Consent Decree against United.  Under the terms of the Consent Decree, United was required to engage in a wide range of remedial actions and changes in hiring practices for minorities, including seniority adjustments, minority recruitment, selection, discipline, reinstatements, and hiring goals for entry level pilot positions.

12.      On September 9, 1988, the EEOC filed an action seeking to enforce the Consent Decree as to provisions covering the hiring of pilots for lack of progress made by United in hiring African American pilots.  As a result, in 1993 and 1994, a series of settlement agreements under the Consent Decree were made covering pilot hiring, requiring, inter alia, changing of practices with respect to minority pilot hiring.

13.      The Consent Decree terminated after more than 20 years of litigation in May, 1995.  At that time, the judge of the case, The Honorable Hubert L. Will, noted as follows:

> We caution that our conclusion is not a determination that employment discrimination may no longer be a problem at United. Despite our best efforts and hopes, we have no delusions that such invidious behavior has entirely ceased to plague the workplace. Rather, it is the court's judgment that any current disputes are properly addressed through fresh complaints to United and the EEOC, and, if necessary, new actions under Title VII….
>
> …
>
> …

It is worth reiterating that the Consent Decree was never intended to serve as a permanent arbiter of racial… discrimination complaints involving United. As is evidenced by the several independent actions now pending in this court, Title VII is and always has been the primary avenue for bringing such charges, and termination of the Consent Decree will do nothing to limit or expand that Congressionally granted protection. As the district court in *Patterson* succinctly expressed in similar circumstances:

> It must be emphasized that the termination of the Consent Decree does not alter defendants' substantive legal obligation to obey the law. Nor does vacating the Consent Decree permit defendants to discriminate against minorities in employment decisions. Title VII and other similar laws remain in effect and are fully applicable to defendants….

*EEOC v. United Airlines, Inc.,* USDC, N.D. IL., Case No. 73-C-972, 1995 US LEXIS 2604, 13-4

(internal citations omitted).

14.     In addition to the long-term Consent Decree proceedings documenting United's history of race-based discrimination, which lasted from 1973-1995, racial discrimination at United Airlines was also the subject of Congressional Hearings in 1987.

15.     On March 2, 1987, a Congressional Hearing entitled "Discrimination Against Blacks at United Airlines" was held before the Government Activities and Transportation Subcommittee of the Committee on Government Operations, House of Representatives, One Hundredth Congress.  The Chairwoman of that Committee noted that in the proceedings:

> United made self-serving statements about its commitment to affirmative action.  But it appears from the evidence collected by this subcommittee that United's efforts have been sporadic and largely designed to give the appearance of commitment.

> United proudly asserted that it adopted a formal affirmative action plan in 1962 and has been a pioneer in advocating equal opportunity employment for minorities and women. Why, then, in 1987, are 99 percent of all the executive officials with the rank of vice president or higher white males?  Why in the history of United airlines, have only two black men reached the rank of vice president?  And why, after 25 years of maintaining formal affirmative action plans, blacks have not been placed in upper level management in significant numbers?"

"Discrimination Against Blacks at United Airlines," Government Activities and Transportation Subcommittee of the Committee on Government Operations, House of Representatives, One Hundredth Congress at 2.

-6-

16.     Although United has made some progress since the Congressional hearings and the federal Consent Decree, Plaintiff believes and therefore avers, as set forth below, that significant vestiges of the long-term discriminatory practices of United Airlines still exist within United, and continue to rear their insidious heads, up to the present day.  In addition, many of the long-term white pilots and white employees who resent these "affirmative action" hearings and Consent Decree years, and the "forced" hiring of African Americans, continue to partake in a culture of resentment and obstruction (and a subculture of explicit racism) when it comes to advancement of African Americans at United.

17.     To this day, there are very few African Americans in senior management and executive and management positions at United.  As Plaintiff's experiences, set forth below, demonstrate, these concerns continue to persist in the present.  Judge Will's caution that the cessation of the Consent Decree is not "a determination that employment discrimination may no longer be a problem at United," *United,* 1995 US LEXIS 2604 at 13, is of particular moment.

18.     This case is a continuation of the long fight for equality and workplace fairness faced by African American pilots at United.

**B.     Backlash From White Chief Pilots Against the
Consent Decree: Formation of a Secret Racially
Discriminatory Club Called, "The Vault"**

19.     After the filing of the Consent Decree enforcement proceedings in 1988, which enforcement proceedings concerned the failure to hire African American pilots, and which proceedings continued until 1994, United was forced to undertake serious actions to recruit African American pilots under strict monitoring. United was required to hire additional African American pilots in order to meet the terms of its Consent Decree obligations.

20.     Thereafter, upon information and belief, the culture of resentment against advancement of African American pilots became more explicit and organized among leaders of the white Chief Pilots at United.

21.     In this regard, several white Chief Pilots formed what they considered to be a secret society called "The Vault."

22.     Upon information and belief, The Vault was and remains a "secret" society of white Chief Pilots with the stated purpose of refusing, obstructing and denying African American pilots assignments and opportunities for advancement and promotion beyond the position of Captain.

23.     From The Vault's depressing and misguided perspective, African American pilots have been hired into United without regard to qualifications and solely because of the Consent Decree, and therefore, they are not worthy of continued opportunities.

24.     At all times relevant hereto, opportunities for pilot advancement and additional work and pay were handed out by a system of "Special Assignments" and non-posted positions.

25.     At all times relevant hereto, Special Assignments were within the exclusive purview of Chief Pilots.

26.     At all times relevant, Chief Pilots had the ability to hand out Special Assignments to whichever persons they desired to provide with such opportunities.

27.     Many Special Assignments are temporary positions, which come with additional pay, and special benefits.

28.     For instance, one form of Special Assignment is a Training Assignment, where a pilot is placed on Special Assignment to conduct trainings or teach classes.  The pilot is provided with additional compensation over and above his regular pay, and paid travel, room and board.

29.     Many other Special Assignments exist and can take the form of, for instance, operations, training, temporary or acting managers, Acting Operations Supervisor, Acting Assistant Chief Pilot, and so forth.

30.     Upon information and belief, besides the extra pay, these Special Assignments provide pilots with additional qualifications and experience that later become relevant when applying for promotions.

31.     These special assignment positions are doled out, pursuant to United policy, by Chief Pilots.  There is no posting or notice of these positions, and no way to apply for specific positions in advance.  Pursuant to long standing United policy, these assignments were filled on an as-needed basis at the discretion of a Chief Pilot.

32.     The Vault, a secret racist organization within United, was formed when several white Chief Pilots, along with managers and executives of United, resentful of the Consent Decree and the forced hiring of African American pilots, decided to get together to do something about the "problem" of African Americans advancing in the organization.

33.     Upon information and belief, Members of the Vault agreed amongst themselves that they would not provide African American pilots with any special assignments, but would only continue to provide those assignments to white pilots.  The idea behind The Vault was to act as a solid wall between African American pilots and their chances for advancement.  By refusing to provide any special assignments to African American pilots, The Vault members did their part to keep the African Americans on "lockdown."  Because these white Chief Pilots controlled all job assignments, all additional opportunities remained locked away, as though in a "vault," and African Americans did not have the key.

34.     Members of The Vault carried the failed and tired racial attitudes of the past.  The court system, from their perspective, was forcing change in the hiring of black pilots.  While they

could not stop the pilots from being hired, in their resentment and racial vindictiveness, they could stop them from obtaining additional opportunities once employed by United, and that is precisely what they set out to do.

35.     Members of The Vault, or persons associated with or acting under the influence, coercion or direction of The Vault, upon information and belief, include, but are not limited to: Captain Keith J. Rimer, current Managing Director and System Chief Pilot and previous Director of the United Airlines Flight Training Center, Captain John Weigand, current Managing Director, Standards, Flight Training Center, Captain Bob McKay, Director of Flight Safety Programs, Chief Pilot Rick Muir, Chief Pilot Rocky Stone, Manager, Flight Technology, Captain Mike McCaskey, Managing Director of Training, Chief Pilot Captain Bo Ellis, Chief Pilot Chuck Crosby, Chief Pilot Bob Jordan, and Chief Pilot Andy Allen.

36.     Upon information and belief, other white Chief pilots were and/or remain members of The Vault, influenced by The Vault or controlled by The Vault.  Many white Chief pilots are either members of The Vault, or are associated with The Vault, or have been pressured or directed by Vault members to implement their practices, or have adopted the practices of The Vault.  The Vault is run by the most powerful Chief Pilots in the company, some of whom are now executives or directors.  The Vault went beyond just withholding positions, to lobbying for their cause to other white pilots and white trainees, and trying to keep the discriminatory practices on "lockdown."  Some white Chief Pilots have agreed to continue these practices at the urging of members of The Vault, but may not even be aware of the group by the name of The Vault.

37.     As Chief Pilot members of The Vault have been promoted into management and executive positions in the company, upon information and belief, they expanded their activities from the simple denial of special assignments to the manipulation of the promotional process in

the form of ensuring applications and information concerning promotions were denied for African American pilots.

38.    Upon information and belief, The Vault still exists, to this very day.  The Vault, whose full membership is "secret," and whose existence is likely to be denied, must be broken up and eliminated once and for all.

39.    The Vault members are responsible for manipulation and denial of the rights of African American pilots like Plaintiff to equal opportunity for assignments, advancement and promotion.  They are a vestige of the old guard, yearning for the days of United's racist past, when African American pilots simply were not hired.   They have engaged in hideous misconduct, intentional racist behavior, and have barely hidden their intentions or desires.  They care not about courts, or Consent Decrees, Congressional hearings, or judges.  They set out to place stumbling blocks in the path of African American pilots to keep them from advancing to management, or gaining additional pay, experience and benefits through special assignments, and in large part, most unfortunately, have been successful in their enterprise.  Plaintiff has no other hope but to respectfully beseech this Honorable Court for assistance, upon proof, in ending The Vault's unlawful discrimination due to his skin color.

40.    It is against the foregoing backdrop that Plaintiff obtained his position of employment with United and has struggled ever since to achieve equality and fairness in the face of institutional racism and adversity.

### C.    Plaintiff's Employment

41.    Plaintiff began his employment with United in 1978.

42.    Plaintiff was hired by United into the position of Second Officer/Flight Engineer.

43.    Prior to Plaintiff's employment with United, Plaintiff attended University of Illinois for two years, and was in the United States Air Force.  Plaintiff earned a degree in

Aviation Science.  Plaintiff worked at Sears Towers as a security guard, and at the same time, Plaintiff was a helicopter pilot and maintenance officer, and was a Green Beret.  Plaintiff is a two-tour Vietnam Veteran, and licensed EMP mechanic.  Plaintiff went from the Army to Air Force pilot training.  He flew transport aircraft and fighter type aircraft, and was hired shortly after that by United.  Once Plaintiff completed his probation at United, Plaintiff went back to college concurrently and earned a B.A. at Chicago State University in Liberal Arts.  He also served in the Illinois National Guard, was the Chief Pilot for the Illinois National Guard, and was in charge of all the maintenance and training for the state of Illinois, and his boss was Governor of Illinois at the time, Gov. Edgar. Plaintiff also receveid his Master's in military history and warfare from American Military University in Virginia, in 1999/2000.  Plaintiff also spent some time at Midway Airlines from 1983 until 1985, because of a furlough at United.

44.     At all times relevant hereto, Plaintiff was more than qualified to be considered for available promotional opportunities at United, including but not limited to management and non-management positions, and all possible special assignments available to pilots.

45.     At all times relevant hereto, Plaintiff has performed the duties of his employment at United in an exemplary manner.

46.     In or around April 10, 1978, Plaintiff became aware of open pilot positions with Defendant United, and submitted an application.

47.     Upon information and belief, Plaintiff was hired in connection with United's requirements to hire minority pilots under the Consent Decree.

48.     Plaintiff's employment history is as follows:

**Position1: Second Officer/Flight Engineer**

**Year: 1978**

**Domicile: Chicago**

[CORRECTED] SEVENTH AMENDED
COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

1   **Chief Pilot(s): name unknown to Plaintiff; in Defendants' records**

2   **Position2: Furloughed from 1983-1985; Plaintiff went to Midway, and was a flight engineer**

3   **and trained new flight engineers.**

4   **Position3: 1985 there was a strike; 727 second officer/flight engineer**

5   **Year: Returned to United in 1985**

6   **Domicile: Chicago**

7   **Chief Pilot(s): name unknown to Plaintiff; in Defendants' records**

8

9   **Position4: 727 first officer**

10  **Year: 1987**

11  **Domicile: Chicago**

12  **Chief Pilot(s): name unknown to Plaintiff; in Defendants' records**

13  **Position5: DC-10 First Officer**

14  **Year: 1990**

15  **Domicile: Chicago**

16  **Chief Pilot(s): name unknown to Plaintiff; in Defendants' records**

17  **Position6: 737 Captain**

18  **Year: 1990**

19  **Domicile: Chicago**

20  **Chief Pilot(s): name unknown to Plaintiff; in Defendants' records**

21  **Position7: 757/767 Captain**

22  **Year: 1996**

23  **Domicile: New York - JFK**

24  **Chief Pilot(s): Bob Spielman**

25  **Position8: 777 Captain**

26

27

28

-13-   [CORRECTED] SEVENTH AMENDED
COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

**Year: 1999-2000**

**Domicile: DC**

**Chief Pilot(s): Chuck Crosby**

**Position9: 777 Captain**

**Year: 2002**

**Domicile: Chicago**

**Chief Pilot(s): Bo Ellis**

**Position10: 747 Captain**

**Year: 2009**

**Domicile: San Francisco**

**Chief Pilot(s): Andy Allen**

49.     Plaintiff believes and therefore avers that his Chief Pilots were associated with the Vault and/or requested by the Vault and/or required by the Vault to participate in the Vault's aforesaid racially discriminatory control of job assignments.

50.     At all times relevant hereto, Plaintiff's Chief Pilots were aware of Plaintiff's availability to accept any opportunities for advancement, special assignments or promotions available, because Plaintiff made same known to his Chief Pilots as a matter of course in each domicile he was assigned, when he met with this Chief Pilots.

51.     Despite Plaintiff's availability to accept such opportunities, Plaintiff watched as Chief Pilots consistently doled out special assignments primarily to white pilots, in a practice known as "shoulder tapping."

52.     Rather than post these positions, or provide assignments based on seniority or qualifications, the Chief Pilots would simply approach a pilot that they desired to provide the assignment.   Because Chief Pilots were operating under the influence of The Vault, that African

Americans would not be given these assignments, as a way to halt their further advancement in the organization, the Chief Pilots simply intentionally did not tap the shoulder of Plaintiff as an African American, or did so only rarely in comparison with Plaintiff's white counterparts.

53.     Plaintiff had no way to apply for any particular special assignment because, as explained, they were not posted, and were doled at the sole discretion of the Chief Pilots, who were members of and/or operating under the influence and/or direction of The Vault, under an illegal agreement to keep special assignments and advancement opportunities from African American pilots.  Upon information and belief, Chief Pilot Rick Muir has expressly stated that there would be no black pilots being promoted.

54.     Plaintiff witnessed his white Chief Pilots "tap the shoulder" of white pilots in providing them with special assignments, for which Plaintiff was equally or more qualified.

55.     Plaintiff believes and therefore avers that white Chief Pilots provided special assignments to white pilots without regard to their domicile, and provided them with special assignments outside of their domicile.

56.     The "shoulder tapping" of white pilots constituted a process of doling out cushy assignments, which supplemented the income of the white pilots and gave them extra experience and qualifications for their resume in applying for promotions.

57.     When it comes to shoulder tapping and members of The Vault, domicile is irrelevant.  They can do and make happen whatever they want, because they are the ones running the system.

58.     From the beginning of Plaintiff's employment through the present, as an African American pilot, Plaintiff was subjected to frequent racial harassment and focus on his race, by comments and conduct of Chief Pilots, other pilots and employees at United, as follows:

a.   Plaintiff's co-pilots would say things like:

   i. they're scraping the bottom of the barrel with women and blacks

   ii. did your get your training at job corps

   iii. blacks aren't interested in flying

 b. One of Plaintiff's co-pilots had "n*gger" written on the board and on his file.

 c. African American pilots have routinely been referred to as "equal opportunity pilots" or "affirmative action hires";

 d. Making jokes about black people, including making fun of their language and using derogatory references; and,

 e. Making offensive comments about the "consent decree" or "consent decree hires," a thinly veiled reference to a racist theory that African American pilots are not qualified, but are just "quota hires";

 f. Indicating a refusal to cooperate or work with African American pilots and employees;

 g. Statements that African American pilots hired through the consent decree would never be promoted.

 h. White pilots would refer to the airline as "Yo-Nitied" in reference to African American pilots.

 i. Common use of the "N"-word among pilots and Chief Pilots.

59. Plaintiff regularly complained to management concerning the discriminatory conduct, but no or insufficient actions were taken by management to remedy such conduct.

 a. For instance, Plaintiff complained to CEO Gerald Greenwald, and Brett Hart.

60. Plaintiff filed his original Complaint in this action in 2012.

61. Since filing his Complaint, Plaintiff has been subjected to acts of intimidation and retaliation by United, as follows:

    a.  Denial of promotions and managerial positions.

    b.  Plaintiff and the group of Plaintiffs who filed the original Complaint in this matter in 2012, and prior EEOC complaints in or around 2010 and 2011, were referred to and branded by United management as members of "the dirty-dozen" (a reference to the first twelve individuals who came forward to engage in civil rights advocacy).  Upon information and belief, this term was coined and used by Chief Pilot Fred Abbot, Captain Roscoe Edwards, Chief Pilot Joe Kolshack, Chief Pilot Walt Clark, Mike New, Chief of Pilot Training, and other chief pilots to refer to any Plaintiffs in the original consolidated Complaint filed in this matter, or other pilots who were part of their group civil rights advocacy.

    c.  This term "dirty dozen" was used and confirmed to be in existence directly by Roscoe Edwards in email communications with Plaintiff Leo Sherman, one of the Plaintiffs in the original Complaint in this matter.

    d.  Plaintiff Leo Sherman advised all of the remaining co-Plaintiffs as to the existence of this derogatory term and the information told to him by Chief Pilot Fred Abbot that none of the Plaintiffs would ever be promoted.

    e.  These derogatory terms and the promise that the Plaintiffs would never be promoted were coined and created in or around 2011, just after the Plaintiffs in the original complaint in this matter, including the instant Plaintiff, made legal demands with respect to the discrimination complained of herein through their former counsel.

62.    Plaintiff believes and therefore avers that he has been denied promotions on the basis of his race and/or in retaliation for his civil rights advocacy including but not limited to the filing and pursuit of the instant litigation.

63.     Plaintiff has applied for the following promotional opportunities, among others, which were denied to Plaintiff in favor of non-African American candidates who were less qualified than Plaintiff:

- VP of Safety and Security went to Bill Yanis, in 2006, despite Plaintiff's application and better qualifications; Bill Yanis was white.

- In December, 2010, Plaintiff Johnson applied for the Managing Director – Technology and Flight Test at the Chicago Headquarters, but the promotion was granted to Plaintiff Johnson's less-qualified Caucasion counterpart, Joseph Burns, with less seniority and and fewer flight hours, based on his race.

- Plaintiff applied for managing director of flight operations at Chicago, and it went to Jim Starly, white, in Dec 2010.

- Plaintiff applied for managing director of crew resources, and it went to Chip Benton, in 2010.

- Plaintiff applied for systems chief pilot in Chicago in 2010, and United gave the job to Bo Ellis.

- In 2011, Plaintiff applied for senior manager of fleet standards for 777, and they chose Dave Lundy, white, who never even flew a 777.

64.     Plaintiff believes that this continued shoulder tapping indicates that The Vault's practices are still going on, to this very day, despite written policies at United purporting to require posting of all positions and special assignments.  The Vault continues to manipulate the assignment and promotional system.

65.     Plaintiff believes and therefore avers that all denials of promotion suffered by him from the year 2010 and forward were distinct acts of retaliation for his being associated with the "Dirty Dozen."  All denials of promotion from the time Plaintiff joined the original complaint in

this action forward were distinct acts of retaliation for his being a Plaintiff before this Honorable Court.

Remainder of page intentionally left blank

**ALLEGATIONS SUBJECT TO PROTECTIVE ORDER-REDACTED**

66.     On or about January 20, 2011, Plaintiff and United entered into a Settlement Agreement (the "Agreement") with respect to Plaintiff's claims of race discrimination against United, including prior EEOC charges of discrimination.

67.     Paragraph 12 of the Agreement sated as follows: "**Non-Retaliation.**   United agrees that it will not retaliate against any [Plaintiff] for having raised any of the Allegations."

68.     The Agreement defines "Allegations" to include claims, "among other things, that United engaged in disparate impact and disparate treatment discrimination against [Plaintiff] and other African-Americans based on their race in violation of the Civil Rights Act of 1964 and 42 U.S.C. § 1981 by not affording them the same opportunities as non-African-Americans in regard to promotions, training, hiring, job placements, compensation, and other terms and conditions of employment…."

69.     After the Agreement was entered into, Plaintiff, and the other members of the United Coalition, were branded by United and its Chief Captains as the "Dirty Dozen," and a determination was made by United, as expressed by Fred Abbot, that none of the United Coalition would ever be promoted.

70.     After the Agreement was entered into, United ensured, acting through Fred Abbot and the Chief Pilots, including but not limited to The Vault, that Plaintiff was subjected to the additional retaliation alleged above, including but not limited to, in accordance with the words of Fred Abbot, denials of employment opportunities, and being branded as the "Dirty Dozen."

71.     In the original Complaint filed in the consolidated *Johnson* action, Plaintiff and other members of the "Dirty Dozen" alleged that after February, 2011, they were subjected to adverse action in retaliation for their raising claims of discrimination and filing with the EEOC claims in 2010.  *See, e.g.,* Original Complaint, Docket # 1, paragraphs 363-371.  Included with

these allegations were causes of action retaliation in violation of Title VII and the California Fair Housing Act. *Id.,* Counts V and VIII, respectively.

72.     The retaliation for having raised the discrimination claims constituted a breach of the Agreement, which was entered into on January 20, 2011.  Specifically, as stated, in paragraph 12 of the Agreement, United agreed "that it will not retaliate against any [Plaintiff] for having raised any of the Allegations."

73.     The promise not to retaliate for having raised claims of racial discrimination was a contractual duty on the part of United, pursuant to paragraph 12 of the Agreement, in addition to the fact that retaliation is illegal and constitutes a separate violation of anti-discrimination statutes.

74.     At all times relevant hereto, Plaintiff was within his valid rights to sue United for the aforesaid retaliation, and such retaliation constituted a breach of the Agreement between Plaintiff and United.

75.     Notwithstanding the foregoing, however, on or about August 18, 2015, United, by and through United's counsel of record in the instant litigation, sent to Plaintiff and his then-counsel a letter threatening Plaintiff with monetary penalties to which United was not entitled, and demanding that Plaintiff: "immediately and effectively remove from his sixth amended complaint, each and every reference, allegation, and any and all content which in any way refers, or relates, directly or indirectly, to anything included in or covered by the Agreement, including but not limited to reference to the Agreement…."

76.     Paragraph 2 of the Agreement stated that Plaintiff agreed the Agreement "shall not be cited, described, referred to, or admissible in any proceeding without United's written consent, **except for a proceeding instituted by a [Plaintiff] or United alleging a breach of this Agreement…."** (emphasis added).

77. Paragraph 12 of the Agreement was a contractual agreement not to retaliate, and made retaliation a breach of the agreement.

78. The allegations of retaliation in the original complaint, and in subsequent complaints, made the instant proceeding a "proceeding instituted by a [Plaintiff]… alleging a breach of th[e] Agreement."

79. The August 18, 2015 threat letter sent to Plaintiff alleged that Plaintiff breached the agreement by his "pursuit and continued litigation of [his] lawsuit."

80. The August 18, 2015 threat letter stated that Plaintiff breached the Agreement by filing his Sixth Amended Complaint on or about June 20, 2015.

81. According to the threat letter, along with the aforesaid alleged breach of "pursuit and continuation of" Plaintiff's lawsuit, there were other "multiple breaches," which breaches included, "many provisions of the Agreement," including but not limited to a breach of the "Covenant Not to Sue," breach of the "Confidentiality and Non-Disparagement," and breach of the "Non-Admission and Inadmissibility" terms contained in the agreement.

82. Paragraph 2 is the "Non-Admission and Inadmissibility" clause and contains an exception for a proceeding alleging a breach of the Agreement.   In this case, the instant proceeding has always alleged retaliation for the 2010 discrimination advocacy, which was covered as an "Allegation" in the Agreement, and for which paragraph 10 of the Agreement promised that United would not retaliate.

83. The Agreement itself contemplates disclosure of, citing to, reference to, and description of the Agreement in the case of retaliation claims, which constitute a breach of the Agreement.

84. The Agreement was drafted by United.

85.     The August, 18, 2015 threat letter made threats to Plaintiff that Plaintiff would suffer harm when United was not entitled to make those threats.

86.     For instance, the threat letter threatens that Plaintiff is now liable for, and demands that Plaintiff immediately pay to United, "all sums" that were paid to Plaintiff "pursuant to the Agreement, except for $200.00…."  The threat letter continues to demand that, in addition to returning any sums received in connection with the Agreement, Plaintiff must immediately pay "'all of United's reasonable attorneys' fees and other litigation costs incurred in defending against' the previously combined *Johnson* lawsuit **and each individual lawsuit post severance**." (emphasis added).

87.     The threat letter continues that Plaintiff must "immediately and effectively remove from his sixth amended complaint, each and every reference, allegation, and any and all content which in any way refers, or relates, directly or indirectly, to anything included in or covered by the Agreement, including but not limited to reference to the Agreement…. [and], allegations which pre date the Agreement."

88.     The threat letter continues to purport that "this letter, which addresses the Agreement, applicable provisions of the Agreement, and breach of the Agreement, is itself subject to and covered by the Agreement.  Pursuant to the detailed terms of the Agreement, including the confidentiality provision, disclosure or use of this letter or any of its contents for any purpose whatsoever by [Plaintiff] is strictly prohibited.  Disclosure or use of any kind constitutes a separate breach of the Agreement."

89.     Finally, the threat letter provided Plaintiff until September 8, 2015 to advise counsel of record for United in the instant proceeding "as to the intent of [Plaintiff] to honor his post breach obligations."

90.     The Agreement contained a liquidated damages provision in the event of breach of confidentiality or covenant not to sue.

91.     The liquidated damages provision allowed United to seek *either* return of the funds paid to Plaintiff in the agreement, *or* to seek reimbursement for reasonable attorney's fees and costs in defending against Plaintiff's suit, not both.

92.     In this multi-plaintiff litigation, involving at different times 22 related cases, all handled by Paul Hastings, over the course of close to four (4) years, one can presume that United's legal fees and expenses for all of the cases combined amount to a very large number.

93.     The threat letter demanded that Plaintiff pay all of United's legal fees and expenses, in addition to return of any funds provided by United in connection with the Agreement.

94.     The demand for both categories of payment was wrongful, contrary to the Agreement, and constituted a false threat.

95.     Moreover, Plaintiff did not breach the Agreement.   Plaintiff filed claims for retaliation for his civil rights advocacy in connection with the Agreement, which retaliation was expressly barred by the Agreement itself, in paragraph 12 thereof.   The Agreement, in paragraph 2, contemplates that parties may file an action alleging a breach of the Agreement.   The retaliation against Plaintiff after February, 2011, constituted a breach of the Agreement.

96.     In addition, outrageously, the threat letter demanded that Plaintiff pay not only the costs and fees incurred by United in Plaintiff's lawsuit, but all costs and fees incurred by United for both the entire *Johnson* proceedings and "each individual lawsuit post severance."   This means that United threatened Plaintiff that Plaintiff had to pay United's costs and fees for all severed lawsuits.

97.     Even assuming, *arguendo,* that United was correct in claiming Plaintiff breached the Agreement, the most Plaintiff would ever have to pay in liquidated damages would be either return of the funds provided to Plaintiff or United's costs incurred in defending against Plaintiff's lawsuit.  Under no circumstances does the Agreement state that Plaintiff would be responsible for the lawsuits of other parties, many of whom were not even parties to the Agreement.

98.     The aforesaid demands constituted a false threat because United demanded monies from Plaintiff, and threatened Plaintiff with substantial financial harm, where United was not entitled to the monies it demanded.

99.     The false threat was made specifically to put fear into Plaintiff and to cause Plaintiff to alter or discontinue his civil rights advocacy before this Honorable Court, and was sent, according to the letter itself, in direct response to Plaintiff's Sixth Amended Complaint.

100.     The threat, but its very terms, sought to require Plaintiff to remove the allegations concerning United's retaliation against Plaintiff from the Sixth Amended Complaint filed before this Honorable Court.

101.     The threat was false because, even in the case that a breach existed on Plaintiff's part, United intentionally inflated the threatened penalty well beyond any liquidated damages provision found in the Agreement.

102.     More basically, however, Plaintiff was always entitled make the allegations he made due to United's breach of the Agreement by engaging in the retaliation, branding Plaintiff part of the "Dirty Dozen," and threatening, after the Agreement, that no members of the Coalition would ever get promotions.

103.     United's breach of the Agreement by engaging in retaliation against Plaintiff was actionable.

104.    The threat letter sent by United, demanding penalties and large monetary amounts that Plaintiff would never be able to pay, well in excess of what United was entitled to demand, constituted an act of retaliation against Plaintiff.

105.    After receiving the letter, Plaintiff reasonably became anxious, fearful, and concerned that he should terminate his civil rights advocacy before this Honorable Court.

106.    The letter was designed to deter Plaintiff's litigation of his valid civil rights claims.

107.    United knew and understood, at the time the threat letter was sent, that it was demanding unreasonable and excessive amounts to which it was not entitled under the Agreement.

108.    Such retaliation was a direct attempt by United to intimidate Plaintiff from continued "pursuit of his lawsuit."

109.    The act of demanding false amounts that are inflated and unreasonable, and to which United was never legally entitled, nor entitled to demand, was knowing and intentional, and had only one purpose: to retaliate against Plaintiff and deter his civil rights advocacy before this Honorable Court.

110.    United, in fact, breached the Agreement one month after it was entered into when United engaged in the retaliatory acts against Plaintiff, branded him part of the "Dirty Dozen," and promised he would never be promoted.

111.    United's attempts to intimidate Plaintiff away from participating in the within civil rights proceedings before this Honorable Court are all the more devious, considering the fact that United breached the Agreement by engaging in the said retaliation as soon as the ink was dry on the Agreement.

112.    United further compounded the wrongful threats by threatening Plaintiff that disclosure of or reference to, or use, in any manner, of the threat letter, would constitute a separate breach of the Agreement.

///

///

Remainder of page intentionally blank

-27-

## V.   Causes of Action

### COUNT I

### RACIAL DISCRIMINATION

### 42 U.S.C. § 1981

### Plaintiff v. Defendants

113.   The allegations in the foregoing paragraphs are incorporated herein by reference.

114.   The foregoing actions of Defendants constitute discrimination against Plaintiff on the basis of his race in violation of 42 U.S.C. § 1981, passed into law after the civil war as part of the Civil Rights Act of 1866, and which provides, in pertinent part, as follows:

(a) Statement of equal rights.

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to *make and enforce contracts*, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property *as is enjoyed by white citizens,* and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

(b) "Make and enforce contracts" defined

For purposes of this section, the term *"make and enforce contracts"* includes the making, *performance, modification*, and termination of contracts, and *the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship*.

(c) Protection against impairment

The rights protected by this section are *protected against impairment by nongovernmental discrimination* and impairment under color of State law.

42 USC Sec. 1981(3) (emphasis added).

115.   Plaintiff, at all times relevant, was a party to a contract of employment with United.

116.   Pursuant to Section 1981, Plaintiff was entitled to the same conditions of employment as his white counterparts.

117. Plaintiff was entitled to the same conditions as his white counterparts in terms of, *inter alia,* performance, modification, and the enjoyment of all benefits, privileges, terms and conditions of the contractual relationship.

118. United's foregoing conduct in treating Plaintiff differently based on the color of his skin harmed Plaintiff in terms of the performance of the employment agreement between the parties as compared to how United performed with white pilots, and it denied Plaintiff the same right to opportunities to modify the agreement, through additional or special assignments or chances for promotion.

119. United's conduct also denied Plaintiff the same enjoyment to which his white counterparts were privy with respect to benefits, privileges, terms and conditions of his employment

120. The white pilots were provided with the privilege of special assignments. Plaintiff was denied this privilege, based upon his race, as aforesaid.

121. Moreover, the denial of this privilege of employment—to be provided with extra assignments to make more money and gain additional experience—was part of an actual intentional scheme to deny this privilege to black pilots.

122. In addition, the knowing maintenance of the racially offensive group by United Chief Pilots and other managers and executives, the purpose of which was to obstruct all possible opportunities for advancement to persons with the skin color of Plaintiff, was a brash, shameless act in the annals of corporate history, and is worthy of punishment by punitive damages.

123. In addition to the denial of the enjoyment of the same privileges, terms and conditions as the white pilots, Plaintiff suffered through a racially hostile work environment over a long term of years.

124.     Plaintiff was subjected to a long-term hostile work environment that was severe and where racially discriminatory conduct was pervasive.

125.     The severe and/or pervasive nature of the conduct at issue also constituted interference with Plaintiff's enjoyment of the same conditions of employment as his white counterparts, who were not subjected to such humiliating and offensive treatment.

126.     As a direct and proximate result of the foregoing actions of Defendants, Plaintiff suffered financial and emotional harm, including but not limited to emotional distress and associated physical manifestations, humiliation and embarrassment as a victim of explicit discrimination, fear, anxiety, loss of promotional opportunity, loss of income, loss of benefits, violation of his civil rights, attorney's fees and costs of suit.

127.     Defendant is liable to Plaintiff pursuant to Section 1981 for compensatory and punitive damages, attorney's fees and costs of suit.

128.     Plaintiff is entitled to injunctive relief under Section 1981 ordering Defendant to remedy all acts of discrimination.

**COUNT II**

**RETALIATION**

**42 U.S.C. § 1981**

**<u>Plaintiff v. Defendants</u>**

129.     The foregoing paragraphs are incorporated by reference.

130.     By and through their actions, as aforesaid, Defendants have retaliated against Plaintiff.

131.     Such retaliation is actionable pursuant to Section 1981.

132.     Defendant is liable to Plaintiff pursuant to Section 1981 for compensatory and punitive damages, attorney's fees and costs of suit.

133.    Plaintiff is entitled to injunctive relief under Section 1981 ordering Defendant to remedy all acts of discrimination.

## COUNT III

## RACIAL DISCRIMINATION

## TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, AS AMENDED

## Plaintiff v. Defendants

134.    The foregoing paragraphs are incorporated by reference.

135.    The foregoing conduct constituted racial discrimination in violation of Title VII of the Civil Rights Act of 1964.

136.    Plaintiff filed a Charge of Discrimination and was issued a Right to Sue Letter prior to initiation of this action.

137.    Defendant is liable to Plaintiff pursuant to Title VII for compensatory and punitive damages, attorney's fees and costs of suit.

138.    Plaintiff is entitled to injunctive relief under Section 1981 ordering Defendant to remedy all acts of discrimination.

## COUNT IV

## RETALIATION

## TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, AS AMENDED

## Plaintiff v. Defendants

139.    The foregoing paragraphs are incorporated by reference.

140.    By and through their actions, as aforesaid, Defendants have retaliated against Plaintiff.

141.    Such retaliation is actionable pursuant to Title VII.

142.   Defendant is liable to Plaintiff pursuant to Title VII for compensatory and punitive damages, attorney's fees and costs of suit.

143.   Plaintiff is entitled to injunctive relief under Title VII ordering Defendant to remedy all acts of discrimination.

**COUNT V**

**RACIAL DISCRIMINATION**

**CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT**

**Plaintiff v. Defendants**

144.   The foregoing paragraphs are incorporated by reference.

145.   The foregoing conduct constituted racial discrimination in violation of the California Fair Employment and Housing Act.

146.   Plaintiff filed a Charge of Discrimination and was issued a Right to Sue Letter prior to initiation of this action.

147.   Defendant is liable to Plaintiff pursuant to the California Fair Employment and Housing Act for compensatory and punitive damages, attorney's fees and costs of suit.

148.   Plaintiff is entitled to injunctive relief under the California Fair Employment and Housing Act ordering Defendant to remedy all acts of discrimination.

**COUNT VI**

**RETALIATION**

**CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT**

**Plaintiff v. Defendants**

149.   The foregoing paragraphs are incorporated by reference.

150.   By and through their actions, as aforesaid, Defendants have retaliated against Plaintiff.

151.    Such retaliation is actionable pursuant to the California Fair Employment and

Housing Act.

152.    Defendant is liable to Plaintiff pursuant to the California Fair Employment and

Housing Act for compensatory and punitive damages, attorney's fees and costs of suit.

153.    Plaintiff is entitled to injunctive relief under the California Fair Employment and

Housing Act ordering Defendant to remedy all acts of discrimination.

**COUNT VII**

**CIVIL RIGHTS CONSPIRACY**

**42 U.S.C §1985**

**<u>Plaintiff v. Defendants</u>**

154.    The foregoing paragraphs are incorporated herein by reference.

155.    The foregoing conduct of The Vault constituted a conspiracy to deny Plaintiff his

civil rights pursuant to federal law, and is actionable as such pursuant to 42 USC Sec. 1985.

156.    United as a corporation was and is responsible for the conduct of the Vault

because, upon information and belief, The Vault operated with tacit or explicit consent of

United, and was and remains comprised of managers and executives of United, who execute

official United policy or custom.

157.    In addition, United engaged in a conspiracy to retaliate against Plaintiff, as

aforesaid.

158.    Accordingly, United, as a corporation, was, at all times relevant, a party to The

Vault's conspiracy.

159.    Defendant is liable to Plaintiff pursuant to Section 1985 for compensatory and

punitive damages, attorney's fees and costs of suit.

160.    Plaintiff is entitled to injunctive relief under Section 1985 ordering Defendant to remedy all acts of discrimination.

## COUNT VIII

## BREACH OF CONTRACT

## Plaintiff v. Defendants

161.    The foregoing paragraphs are incorporated herein by reference.

162.    Defendants' aforesaid conduct constituted a breach of contract.

163.    Defendants are liable to Plaintiff pursuant to the breach of contract for compensatory damages, specific performance of violated contract terms aforesaid, to the extent possible, and/or to have Plaintiff relieved from any further responsibilities under the contract as a result of Defendants' breach, and to declare same as null and void.

///

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests this Honorable Court to enter judgment in his favor, and against Defendants, and to order the following relief:

(a)   Compensatory damages on each count in an amount to be determined at trial;

(b)   Punitive damages on counts I through VII in an amount to be determined at trial;

(c)   A declaratory judgment that United has violated Plaintiff's rights under Count of this [CORRECTED] SEVENTH Amended Complaint;

(d)   Injunctive relief as follows:

a.   An order appointing a civil rights monitor, trustee, or master over United to assure compliance with any injunctive relief granted by the Court, and who should be authorized to conduct factual investigations and make reports and recommendations to the court concerning United's progress in implementing all remedies;

b.   An Order requiring United to immediately cease and desist from all acts of discrimination and retaliation;

c.   An Order requiring United to take all necessary actions to require The Vault to cease and desist from further racial discrimination, to investigate the practices of The Vault, and to take such actions are required to break up The Vault so that its members can no longer manipulate special assignment and promotional practices;

d.   An Order requiring United's managers to complete racial sensitivity training;

e.  An Order requiring United to notify Plaintiff of any and all special assignments available and to provide Plaintiff with an opportunity to apply for same;

f.  An Order requiring United to terminate the "tap on the shoulder" process of promotions and special assignments;

g.  An Order requiring United to complete an investigation into the acts of retaliation complained of herein;

h.  An Order requiring United to designate local civil rights representatives in Plaintiff's domicile Flight Offices, available to confidentially take and process any complaints of discrimination;

i.  An Order requiring United to remedy all acts of racial discrimination by making Plaintiff whole in terms of the non-monetary privileges, benefits, and conditions of his employment;

j.  Equitable relief for the breach of contract; and,

(e)  Such further or additional relief as may be appropriate or that the interests of justice may require.

///

1

2
Respectfully submitted this 21st day of January, 2016.

3
*/s/ Brian R. Mildenberg____*

4
Brian R. Mildenberg, Esquire
(PA BAR ID. 84861) *(pro hac vice)*

5
MILDENBERG LAW FIRM, PC
1735 Market Street, Suite 3750

6
Philadelphia, PA 19103

7
(215) 545-4870
brian@mildenberglaw.com

8

9
Attorney for Plaintiff
ELDRIDGE JOHNSON

10

11
Of Counsel:
Conor J. Corcoran, Esquire

12
THE LAW OFFICE OF J. CONNOR CORCORAN, PC
1500 JFK Boulevard, Suite 1500

13
Philadelphia, PA 19102

14
Local Counsel:
Richard J. Idell, Esquire

15
THE IDELL FIRM, PC
495 California Street, Suite 500

16
San Francisco, CA 94104

17

18

19

20

21

22

23

24

25

26

27

28

1

2

**CERTIFICATE OF SERVICE**

3

I, Brian R. Mildenberg, Esquire hereby certify that on the 21st day of January, 2016, I

4

served counsel of record for all Defendants by filing the foregoing [CORRECTED] SEVENTH

5

Amended Complaint on the Court's ECF system, whereby notice is provided to counsel of

6

record for Defendants and the document is available for viewing and downloading.

7

8

9

Respectfully submitted this 21st day of January, 2016.

10

11

*/s/ Brian R. Mildenberg*

12

Brian R. Mildenberg, Esquire
(PA BAR ID. 84861) *(pro hac vice)*

13

MILDENBERG LAW FIRM, PC

14

1735 Market Street, Suite 3750
Philadelphia, PA 19103

15

(215) 545-4870
brian@mildenberglaw.com

16

17

Attorney for Plaintiff
ELDRIDGE JOHNSON

18

19

20

21

22

23

24

25

26

27

28